UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| ORCINUS HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SYNCHRONOSS TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 18-CV-06199-LHK<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 27 |

Plaintiff Orcinus Holdings, LLC filed a patent infringement suit against Defendant Synchronoss Technologies, Inc. Plaintiff alleges that Defendant infringes claims of U.S. Patent No. 7,567,541 ("the '541 Patent"). Before the Court is Defendant's motion to dismiss, which contends that the claims of the '541 Patent fail to recite patent-eligible subject matter under 35 U.S.C. § 101. ECF No. 27. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendant's motion to dismiss the '541 Patent claims.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties and Technology at Issue

Plaintiff, a wholly-owned subsidiary of Dropbox Inc. ("Dropbox"), is a Delaware

corporation with its principal place of business in San Francisco, California. ECF No. 1 (complaint, or "Compl.") at ¶ 1. Dropbox was founded in June 2007, and launched "as a simple way for people to access their files wherever they are and share them easily." *Id.* at ¶ 9.

Defendant is a Delaware corporation with its principal place of business in Bridgewater, New Jersey, and conducts business from a permanent physical location in San Jose, California. *Id.* at ¶¶ 2, 5. Defendant sells its "Personal Cloud" product "as a white-label data backup and transfer solution to network operators or service providers, such as Verizon." *Id.* at ¶ 16. Plaintiff alleges that the "Personal Cloud" product, as well as other Synchronoss Cloud products, infringe the '541 Patent. The Court next summarizes the Patent.

### 2. The '541 Patent

The '541 Patent is entitled "System and Method for Personal Data Backup for Mobile Customer Premises Equipment." '541 Patent at front page. It was filed on October 18, 2005, and issued on July 28, 2009. *Id.*

The claims of the '541 Patent generally relate to backing up data from a "customer premises equipment" ("CPE") such as "cell phones, personal digital assistants (PDAs), iPods™, and MP3™ digital recorders." *Id.* at 2:64-66. More specifically, the '541 Patent is directed to uploading and downloading data from a CPE to a server by way of a mobile network. *Id.* at 3:56-4:4, 5:19-20. The Court first discusses the aspect of uploading data from a CPE to a server, then retrieving data from the server to the CPE.

Assume the CPE is a cellphone. First, either the cellphone or the server initiates the backup process in response to an elapsed time. *Id.* at 3:57-59. In other words, the backup process is on a timer, and once enough time has elapsed for a predetermined time interval, the server initiates the backup process. In one embodiment, the server initiates the backup process by generating an update request signal. *Id.* at 3:61-62. "This signal may also indicate the type of data requested, including a full backup of all data, or only the backup of changed data . . . ." *Id.* at 3:63-65. A switch, which is an access point to a mobile network, then forwards the signal to the cellphone. *Id.* at 3:2-3, 4:1. The backup data is "structured by tagging required data in accordance with the data

2

type. XML, html, or other methods . . . may be used to create the structured data." *Id.* at 4:10-13.
The cellphone then transmits the backup data across the mobile network to the switch. *Id.* at 4:21-



Figure 1

23. Once the data transfer process has transferred all of the relevant data from the cellphone to the switch, which then transfers the data to the server, the server terminates the data transfer. *Id.* at 4:38-45. At that point, the server restarts the timer for the predetermined time interval at which updates take place. *Id.* at 4:45-47.

Figure 1 exemplifies uploading data from a CPE to a server. In response to an elapsed time signal (item 105) that signals the beginning of a backup cycle, the server (item 104) generates an update request signal (item 106). *Id.* at 3:59-65. The server's update request signal (item 106) is transmitted to the mobile network's switch (item 103), which forwards the update request signal (item 107) to the CPE (item 101), such as a cellphone. *Id.* at 4:1. The CPE (item 101) prepares the data to be backed up, and then begins to transfer the data in one or more "Info signals" (item 109)

3

to the switch (item 103), which passes the Info signal (item 110) onto the server (item 104). *Id.* at 4:26-30. An acknowledgement "Ack" signal (items 111 and 112), acknowledging the receipt of the data, might be sent from the server (item 104) through the switch (item 103) across the mobile network (item 102) to the CPE (item 101). *Id.* at 4:30-33. "[I]f more data is to be downloaded, a next Info signal is sent" (item 113 and 114) from the CPE (item 101) across the mobile network (item 102) through the switch (item 103) to the server (item 104). *Id.* at 4:35-38. "The entire process may be repeated until the last information signal is sent by CPE [(item 101)] in which a last Info data component is provided to the structure or an END signal is transmitted to indicate to server [(item 104)] that the entire information should have been received." *Id.* at 4:38-42. Once the server determines that transmission is completed "by a successful optional END signal being acknowledged in [items 118, 119, or some other means, server [item] 104 starts the timer for the predetermined time interval [(item 117)] . . . and the cycle is repeated." *Id.* at 4:43-47.

Second, stored data can be retrieved from the server and uploaded to the CPE. The CPE,



Figure 2

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

such as a cellphone, transmits a retrieve request signal over the mobile network to the switch. *Id.* at 5:24-25. The switch then transmits the retrieve request signal to the server. *Id.* at 5:34-35. In response, the server transmits data to the switch, which then transmits data to the CPE. *Id.* at 5:44-48.

Figure 2 exemplifies retrieving data from the server to the CPE. In Figure 2, "a user initiates the retrieval of the stored data" from the server (item 104) by "dialing" in accordance with item 205. *Id.* at 5:22-23. Or, the retrieval process can be initiated by processes described above, such as in response to an elapsed time signal. *Id.* at 3:59-61, 5:23-24, 6:31-33. The CPE (item 101) transmits the retrieve request signal (item 206) to the switch (item 103). *Id.* at 5:24-25. The switch (item 103) then transmits the retrieve request signal (item 207) to the server (item 104). *Id.* at 5:34-35. The server (item 104) then prepares the data to be transmitted. *Id.* at 5:49-64. Data begins to be transmitted from the server (item 104) to the switch (item 103) via an information signal (item 209). *Id.* at Fig. 2. The switch (item 103) then transmits the information signal (item 210) across the mobile network (item 102) to the CPE (item 101). *Id.* at 5:65-66. An acknowledgement signal (items 212 and 213) might be sent by the CPE (item 101) through the switch (item 103) to the server (item 104). *Id.* at 6:1-3. "If more data is to be sent, then successive information signals are forwarded" in items 214 and 215 through the switch (item 103). *Id.* at 6:3-5. The last information signal to be sent "may include an end of data signal END" received by the CPE (item 101).

Plaintiff asserts that Defendant "directly infringed and continues to directly infringe one or more claims of the '541 Patent." Compl. at ¶ 29. Defendant's motion to dismiss focuses on claim 1.[1] Claim 1 recites:

1. A method for backing up data stored on a mobile customer premises equipment comprising the steps of:

storing data at the mobile customer premises equipment;

---

[1] Plaintiff has not identified any representative claims of the '541 Patent. As discussed below, the Court finds claim 1 to be representative of the '541 Patent.

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

formatting the data stored at the mobile customer premises equipment into fields by determining data fields, identifying which portions of said data correspond to a respective data field, and tagging said data,

transmitting the data with a user ID from the mobile customer premises equipment across a mobile network to a server for storage;

retrieving said data from said server across a mobile network in response to one of an expiration of time and request from said mobile customer premises equipment by transmitting said data to said mobile customer premises equipment; and

transmitting said data to said mobile customer premises equipment by transmitting the data in more than one information signal and sequentially numbering each of said information signals.

**B. Procedural History**

On June 20, 2018, in *Dropbox, Inc. v. Synchronoss Technologies, Inc.* ("the Dropbox Action"), Dropbox filed a related patent infringement suit asserting the '541 Patent as well as U.S. Patent No. 6,058,399 and U.S. Patent No. 6,178,505. Case No. 18-CV-03685-LHK, ECF No. 1. On August 13, 2018, in the Dropbox Action, Defendant filed a motion to dismiss. *Id.*, ECF No. 24 ("Mot."). On August 27, 2018, Dropbox filed an opposition. *Id.*, ECF No. 27 ("Opp."). On September 4, 2018, Defendant filed a reply. *Id.*, ECF No. 31 ("Reply").

On October 18, in the Dropbox Action, Dropbox filed a motion to amend the complaint. *Id.*, ECF No. 46. In its motion to amend the complaint, Dropbox sought to "remove its assertion of U.S. Patent No. 7,567,541 . . . from this lawsuit" because Dropbox's wholly-owned subsidiary, Orcinus Holdings LLC (i.e., Plaintiff), was going to assert that patent in another case (i.e., the instant action). *Id.*, ECF No. 46 at 1.

On October 10, 2018, Plaintiff filed the instant patent infringement suit asserting just the '541 Patent against Defendant. ECF No. 1. On November 5, 2018, Defendant filed the instant motion to dismiss, incorporating the briefing from the Dropbox Action. ECF No. 27. On November 9, 2018, Plaintiff filed an opposition, incorporating the briefing from the Dropbox Action. ECF No. 32. On November 16, 2019, Defendant filed a reply, incorporating the briefing

6

from the Dropbox Action. ECF No. 33. Thus, even though the parties' briefing discusses U.S. Patent Nos. 6,058,399 and 6,178,505, these patents are not at issue in the instant motion to dismiss because they are no longer being asserted against Defendant in the instant case; instead, these 2 patents are asserted against Defendant in the related Dropbox Action.

Also, in the complaint, Plaintiff fails to identify any specific claims that are being asserted against Defendant. *See, e.g.*, Compl. at ¶ 29 ("Synchronoss directly infringed and continues to directly infringe one or more claims of the '541 Patent . . . ."). So, by the time Defendant refiled its motion to dismiss, the complaint had not put Defendant on notice as to which specific claim or claims in the '541 Patent Defendant is alleged to have infringed.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'[a] plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . .

claim." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

### B. Motion to Dismiss for Patent Eligibility Challenges Under 35 U.S.C. § 101

Defendant's motion argues that the patents-in-suit fail to claim patent-eligible subject matter under 35 U.S.C. § 101 in light of the U.S. Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014). The ultimate question whether a claim recites patent-eligible subject matter under § 101 is a question of law. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) ("Patent eligibility under § 101 is an issue of law[.]"); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) (same). However, the Federal Circuit has identified that there are certain factual questions underlying the § 101 analysis. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018). Accordingly, a district court may resolve the issue of patent eligibility under § 101 by way of a motion to dismiss. *See, e.g.*, *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) (affirming determination of ineligibility made on 12(b)(6) motion); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) (same).

Although claim construction is often desirable, and may sometimes be necessary, to resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has explained that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction*, 776 F.3d at 1349; *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 539 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016).

### C. Substantive Legal Standards Applicable Under 35 U.S.C. § 101

#### 1. Patent-Eligible Subject Matter Under 35 U.S.C. § 101

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Id.* (quoting 35 U.S.C. § 101). These categories are broad, but they are not limitless. Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). These three categories of subject matter are excepted from patent-eligibility because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (citations omitted). The U.S. Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.* However, the U.S. Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (alteration, internal quotation marks, and citation omitted). Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

In *Alice*, the leading case on patent-eligible subject matter under § 101, the U.S. Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77. *Alice*, 573 U.S. at 217. This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"— *i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible

9

concept] itself."

*Id.* at 217-18 (alterations in original) (citations omitted); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the [U.S.] Supreme Court in *Alice*").

### 2. *Alice* Step One—Identification of Claims Directed to an Abstract Idea

Neither the U.S. Supreme Court nor the Federal Circuit has set forth a bright-line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework. *See, e.g., Alice*, 573 U.S. at 221 (noting that "[the U.S. Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the U.S. Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice* (citation omitted)). As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Two of the U.S. Supreme Court's leading cases concerning the "abstract idea" exception involved claims held to be abstract because they were drawn to longstanding, fundamental economic practices. *See Alice*, 573 U.S. at 219 (claims "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" were directed to a patent-ineligible abstract idea); *Bilski*, 561 U.S. at 611-12 (claims drawn to "the basic concept of hedging, or protecting against risk" were directed to a patent-ineligible abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class" (citation omitted)).

Similarly, the U.S. Supreme Court has recognized that information itself is intangible. *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n.12 (2007). Accordingly, the Federal Circuit has generally found claims abstract where they are directed to some combination of acquiring information, analyzing information, and/or displaying the results of that analysis. *See*

10

*FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-95 (Fed. Cir. 2016) (claims "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected" were drawn to a patent-ineligible abstract idea); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea because "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions"); *In re TLI Commc'ns LLC*, 823 F.3d at 611 (claims were "directed to the abstract idea of classifying and storing digital images in an organized manner"); *see also Elec. Power Grp.*, 830 F.3d at 1353-54 (collecting cases).

However, the determination of whether other types of computer-implemented claims are abstract has proven more "elusive." *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) ("[P]recision has been elusive in defining an all-purpose boundary between the abstract and the concrete[.]"). As a result, in addition to comparing claims to claims in U.S. Supreme Court and Federal Circuit precedents, courts considering computer-implemented inventions have taken varied approaches to determining whether particular claims are directed to an abstract idea.

For example, courts have considered whether the claims "purport to improve the functioning of the computer itself," *Alice*, 573 U.S. at 225, which may suggest that the claims are not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract process, *Enfish*, 822 F.3d at 1336; *see also id.* at 1335 ("[S]ome improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like. Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract[.]"). The Federal Circuit has followed this approach to find claims patent-eligible in several cases. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims directed to an improved memory system were not abstract because they "focus[ed] on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor"

(quoting *Enfish*, 822 F.3d at 1336)); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims directed to automating part of a preexisting method for 3-D facial expression animation were not abstract because they "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type"); *Enfish*, 822 F.3d at 1335–36 (claims directed to a specific type of self-referential table in a computer database were not abstract because they focused "on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database)").

Similarly, the Federal Circuit has found that claims directed to a "new and useful technique" for performing a particular task were not abstract. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (holding that "claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform" were not abstract); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048, 1050 (Fed. Cir. 2016) (holding that claims directed to "a new and useful laboratory technique for preserving hepatocytes," a type of liver cell, were not abstract); *see also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (holding that claims for a method to cure rubber that employed a formula to calculate the optimal cure time were not abstract).

Another helpful tool used by courts in the abstract idea inquiry is consideration of whether the claims have an analogy to the brick-and-mortar world, such that they cover a "fundamental . . . practice long prevalent in our system." *Alice*, 573 U.S. at 219; *see, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (finding an email processing software program to be abstract through comparison to a "brick-and-mortar" post office); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized 'brick and mortar' context." (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)).

Courts will also (or alternatively, as the facts require) consider a related question of

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

whether the claims are, in essence, directed to a mental process or a process that could be done with pencil and paper. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1147 (Fed. Cir. 2016) (claims for translating a functional description of a logic circuit into a hardware component description of the logic circuit were patent-ineligible because the "method can be performed mentally or with pencil and paper"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the Internet was patent-ineligible because the "steps can be performed in the human mind, or by a human using a pen and paper"); *see also, e.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for computer-implemented system to enable borrowers to shop for loan packages anonymously were abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer").[2]

Regardless of the particular analysis that is best suited to the specific facts at issue in a case, however, the Federal Circuit has emphasized that "the first step of the [*Alice*] inquiry is a meaningful one, i.e., . . . a substantial class of claims are *not* directed to a patent-ineligible concept." *Enfish*, 822 F.3d at 1335. The court's task is thus not to determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter," *Internet Patents*, 790 F.3d at 1346.

### 3. *Alice* Step Two—Evaluation of Abstract Claims for an Inventive Concept

A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Thus, the second step of the *Alice* analysis (the search for an "inventive concept") asks whether the claim contains an element

---

[2] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be unthinkingly applied. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans engaged in the same activity long before the invention of computers," and concluding that test was unhelpful where "error correction codes were not conventional activity that humans engaged in before computers").

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

or combination of elements that "ensure[s] that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." 573 U.S. at 218 (citation omitted).

The U.S. Supreme Court has made clear that transforming an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347-48 (alteration in original) (quoting *Alice*, 134573 U.S. at 225); *see also Mortg. Grader*, 811 F.3d at 1324-25 (holding that "generic computer components such as an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement"); *Bancorp Servs.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.").

Likewise, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions. *In re TLI Commc'ns LLC*, 823 F.3d at 613 (citation omitted); *see also id.* (ruling that "telephone unit," "server," "image analysis unit," and "control unit" limitations were insufficient to satisfy *Alice* step two where claims were drawn to abstract idea of classifying and storing digital images in an organized manner). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. This inquiry "goes beyond what was simply known in the prior art." *Id.* at 1369.

In addition, the U.S. Supreme Court explained in *Bilski* that "limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable." 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)); *see also Alice*, 573 U.S. at 222

14

(same). The Federal Circuit has similarly stated that attempts "to limit the use of the abstract idea to a particular technological environment" are insufficient to render an abstract idea patent-eligible. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal quotation marks and citation omitted); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").

In addition, a "non-conventional and non-generic arrangement of known, conventional pieces" can amount to an inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). For example, in *BASCOM*, the Federal Circuit addressed a claim for Internet content filtering performed at "a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* Because this "specific location" was different from the location where Internet content filtering was traditionally performed, the Federal Circuit concluded this was a "non-conventional and non-generic arrangement of known, conventional pieces" that provided an inventive concept. *Id.* As another example, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit held that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the invention's distributed architecture." 841 F.3d 1288, 1301 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (Nov. 27, 2017). The use of a "distributed architecture," which stored accounting data information near the source of the information in the disparate networks, transformed the claims into patentable subject matter. *Id.*

### 4. Preemption

In addition to these principles, courts sometimes find it helpful to assess claims against the policy rationale for § 101. The U.S. Supreme Court has recognized that the "concern that undergirds [the] § 101 jurisprudence" is preemption. *Alice*, 573 U.S. at 223. Thus, courts have readily concluded that a claim is not patent-eligible when the claim is so abstract that it preempts "use of [the claimed] approach in all fields" and "would effectively grant a monopoly over an

abstract idea." *Bilski*, 561 U.S. at 612. However, the inverse is not true: "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *FairWarning*, 839 F.3d at 1098 (alteration in original) (citation omitted).

## III.    DISCUSSION

Defendant's motion to dismiss contends that the claims of the '541 Patent fall within the patent-ineligible "abstract ideas" exception to § 101. The Court applies the *Alice* framework described above to the '541 Patent. However, the Court need not individually analyze every claim if certain claims are representative. *See generally Alice*, 573 U.S. at 224-27 (finding claims to be patent-ineligible based on analysis of one representative claim). Here, the parties do not agree on any representative claims. Nevertheless, in the absence of agreed-upon representative claims, the Court need not analyze each and every claim of the patent. *Content Extraction*, 776 F.3d at 1348. A district court may conduct its own analysis and determine which claim or claims are representative if "all the claims are substantially similar and linked to the same . . . idea." *Id.* (internal quotation marks omitted).

First, the Court discusses the representative claims of the '541 Patent, then turns to the substantive *Alice* analysis of the '541 Patent.

### A.  Representative Claim of the '541 Patent

The Court finds that claim 1 is representative of the '541 Patent. Claim 1 encapsulates the other claims in the '541 Patent, which are "substantially similar" and "linked to the same . . . idea," per the *Content Extraction* court. 776 F.3d at 1348. The Federal Circuit has also held that if the claims "contain only minor differences in terminology but require performance of the same basic process, . . . they should rise or fall together." *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1368 n.7 (Fed. Cir. 2017).

Claim 1 discloses: (1) storing data at the mobile customer premises equipment ("CPE"); (2) formatting the data stored at the CPE; (3) transmitting the data with a user ID from the CPE across a mobile network to a server; (4) retrieving data stored in the server in response to either an expiration of time or a request from the CPE; and (5) transmitting the data to the CPE in multiple

16

sequentially-numbered information signals. '541 Patent at 10:52-11:4.

The remaining independent claims (claims 11, 17, and 21) of the '541 Patent are directed to concepts that are substantially similar to and require performance of the same idea as claim 1, per the *Content Extraction* and *Smart Systems Innovations* courts.

For instance, claim 11 is directed to a "method for backing up data stored on a mobile customer premises equipment," which is identical to claim 1, also directed to a "method for backing up data stored on a mobile customer premises equipment." *Id.* at 10:52-53, 11:31-32. Claim 11 is also similarly directed to the idea of transmitting data "from the mobile customer premises equipment across a mobile network to a server for storage," which claim 1 discloses in its step of transmitting the data with a user ID from the CPE across the mobile network to a server. *Id.* at 10:60-62, 11:38-40.

Moreover, claim 17 similarly is directed to a "system for backing up data on a mobile customer premises equipment." *Id.* at 12:7-8. Claim 17 discloses a CPE on which data is stored and formatted, transmitting the data from the CPE to a server, then retrieving the data from the server in response to either an expiration of time or a request from the CPE. *Id.* at 12:8-25. These steps are all disclosed by claim 1, which also discloses "storing data" at the CPE, "formatting the data" stored at the CPE, "transmitting the data" from the CPE to a server, then "retrieving said data from said server" in response to either an expiration of time or request from the CPE. *Id.* at 10:54-67.

Likewise, claim 21 is similarly directed to a "system for backing up data on a mobile customer premises equipment." *Id.* at 12:34-35. Claim 21 discloses a CPE on which data is stored, formatted, then transmitted to a server. *Id.* at 12:36-51. Only "changes in data which have occurred since a previous transmission" are transmitted to the server. *Id.* at 12:45-47. As discussed above, claim 1 discloses "storing data" at the CPE, "formatting the data stored at the CPE," then "transmitting the data" from the CPE to a server. *Id.* at 10:54-67. It is of no moment that claim 21 discloses that only *changes* in data are transmitted to the server. Claim 1 already encapsulates the fundamental idea of data transfer between the CPE and the server, so the underlying idea of data

transfer between the CPE and the server is the same for claims 1 and 21.

Plaintiff cites to claims 6 and 8 as disclosing "new and different techniques" not represented in representative claim 1. Opp. at 17. For instance, "Claim 6 includes sending a server ID with an update request, and Claim 8 includes sending a user ID with a retrieval request to the server." *Id.* Claim 6 depends from claim 5, which in turn depends from claim 1. Claim 6 and claim 1 "require performance of the same basic process" of data transfer using a server. *Smart Sys. Innovations*, 873 F.3d at 1368 n.7. Claim 6 appends nothing more than an identificatory label to the server, which does not defeat the basic idea that the two claims are directed to the same idea of using a server in the process of data transfer. Therefore, claim 1 is still representative of claim 6. Likewise, claim 8 depends from claim 7, which depends from claim 5, which depends from claim 1. Claim 8 discloses the use of a user ID with retrieving data from the server. However, claim 8 does not differ from the same basic process as claim 1 because claim 1 also discloses retrieving data from the server. Claim 8, like claim 6, merely adds an identificatory label to the process of retrieving data from the server, which does not change the basic process of retrieving data from the server. Thus, claim 1 is representative of claim 8.

In sum, claim 1 is representative of the claims of the '541 Patent. Next, the Court conducts the *Alice* analysis for claim 1 of the '541 Patent.

## B. *Alice* Step One for Claim 1 of the '541 Patent—Whether the Claim is Directed to an Abstract Idea

Defendant argues that the '541 Patent is directed toward the abstract idea of "storing, formatting, transmitting, and retrieving data." Mot. at 22. Plaintiff responds by arguing that the '541 Patent is not directed toward an abstract idea because the "claimed invention . . . is a technological solution for backing up and transferring data across different customer premises equipment (CPE)—a specialized solution to a specific problem that did not previously exist." Opp. at 18.

Step one of the *Alice* framework directs the Court to assess "whether the claims at issue are directed to [an abstract idea]." *Alice*, 573 U.S. at 218. The step one inquiry "applies a stage-one

filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335 (citation omitted). Thus, the Court conducts its step one inquiry by first identifying what the "character as a whole" of claim 1 of the '541 Patent is "directed to," and then discussing whether this is an abstract idea. In distilling the character of a claim, the Court is careful not to express the claim's focus at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. *Enfish*, 822 F.3d at 1337; *see also Thales Visionix*, 850 F.3d at 1347 ("We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.").

The Court finds that claim 1 of the '541 Patent is directed to the abstract idea of transmitting and retrieving data. Claim 1 is straight-forward. It discloses (1) storing data at the mobile customer premises equipment ("CPE"); (2) formatting the data stored at the CPE; (3) transmitting the data with a user ID from the CPE across a mobile network to a server; (4) retrieving data stored in the server in response to either an expiration of time or a request from the CPE; and (5) transmitting the data to the CPE in multiple sequentially-numbered information signals. '541 Patent at 10:52-11:4.

Claim 1 is abstract because first, it only discloses generalized steps to carry out generic computer functions, and second, because there are long-standing practices analogous to the claimed steps.

### 1. Claim 1 Discloses Generalized Steps to Carry Out Generic Computer Functions

Claim 1 is not directed to a specific improvement to computer functionality. Rather, the Federal Circuit has recognized that "[g]eneralized steps to be performed on a computer using conventional computer activity are abstract." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal quotation marks omitted). For instance, the Federal Circuit found that a patent claim for taking digital images using a telephone, storing the images, then transmitting the images to a server which receives the images failed step one of *Alice*. *TLI*, 823

19

F.3d at 610, 612. In explaining why the patent claim failed step one of *Alice*, the *TLI* court wrote:

> Contrary to TLI's arguments on appeal, the claims here are not directed to a specific improvement to computer functionality. Rather, they are directed to the use of conventional or generic technology in a nascent but well-known environment . . . . The specification does not describe a new telephone, a new server, or a new physical combination of the two. The specification fails to provide any technical details for the tangible components, but instead predominantly describes the system and methods in purely functional terms. For example, the "telephone unit" of the claims is described as having "the standard features of a telephone unit" . . . . Likewise, the server is described simply in terms of performing generic computer functions such as storing, receiving, and extracting data.

*Id.* In essence, the *TLI* court found that because the *TLI* patent's specification failed to provide technical details for the components, but instead described the system and methods "in purely functional terms," functions that were generic to a computer, the *TLI* patent claim failed step one of *Alice*. *Id.*

The '541 Patent's specification concedes that the methods, which are described in purely functional terms, are generic to a computer. Moreover, what little tangible components are disclosed in claim 1 are entirely generic computing components.

First, the disclosed CPE is a generic computer. The specification gives examples of CPEs: "mobile devices such as cell phones, personal digital assistants (PDAs), iPods™ and MP3™ digital recorders (collectively known as CPEs)." '541 Patent at 2:64-66. In the background of the invention, the Patent discloses "cell phones, iPods, MP3 players, pagers, personal digital assistants (PDA), even personal computers" as devices well known in the prior art as they have become more "personalized" over time. *Id.* at 1:19-22. The specification provides no additional detail as to whether the CPEs are customized or specialized computing devices. Rather, the specification uses a cellphone as an example of a CPE without ever specifying whether the cellphone is a specialized computing device. *See, e.g.*, *id.* at 3:1-2 ("A CPE [] such as a cell phone is part of a mobile communications network [].") Thus, like the *TLI* patent, the '541 Patent fails to provide technical details for the tangible components of the claim, such as the CPE.

Second, the process of formatting the data stored at the CPE invokes generic computing

20

devices. The specification admits that "[f]ormatting is performed by [the] CPE," *id.* at 5:50-51, and as discussed above, the CPE is a generic computing device. Moreover, the process of formatting the data is conventional and well-known in the art. Claim 1 discloses that the process of formatting the data consists of "tagging" data that "correspond to a respective data field." *Id.* at 10:57-59. However, the patent specification concedes that as "*known in the art*, the structure of the data may identify each element type by using unique *tags* for the different record types. . . . By utilizing a unified tag and data structure, the methodology and system enables different types of CPE to interpret the data structure accordingly." *Id.* at 3:34-42 (emphasis added). Thus, the Patent itself concedes that the process of tagging data that correspond to a respective data field was known in the art, and thus conventional. Claims that are "directed to the use of conventional or generic technology" are abstract. *TLI*, 823 F.3d at 612.

Third, the process of transmitting the data with a user ID from the CPE across a mobile network to a server is known in the art and generic. The specification admits that "communication methods, *as known in the art*, may be utilized to transmit the data between CPE 101 and server 104." '541 Patent at 3:45-47 (emphasis added). Further, use of a user ID in conjunction with the transmission of data is hardly a specific improvement on computer functionality or a nongeneralized computer activity. The specification vaguely and generally defines user ID as "an identifier . . . to identify the device for which data is being backed up." *Id.* at 3:24-25. Per the *Content Extraction* court, the "concept of data collection, *recognition*, and storage is undisputedly well-known." 776 F.3d at 1347 (emphasis added). Moreover, the mobile network is generic, as disclosed in the specification. '541 Patent at 3:2-3 ("As is known in the art, mobile network 102 has an access point at a switch 103."). The Patent neither adds any more specificity nor discloses any improvement on the mobile network to render it a non-generic mobile network. Furthermore, the server is also a generic server. *See, e.g.*, *id.* at 2:1-2 ("The remote server receives data from the CPE for remote storage by the server."); *id.* at 2:20-21 ("The server collects the data and stores it."); *id.* at 5:10-13 ("[S]erver 104 could easily be another CPE, either inside or outside of network 102, or a server located within network 102 communicating with the target CPE across a mobile

network."); *see also TLI*, 823 F.3d at 611 (recitation of a generic "server" "merely provide[d] a generic environment in which to carry out the abstract idea"). Plaintiff even admits in the opposition that servers "may have been known" in the prior art. Opp. at 19. Thus, though the server is a tangible element of the claim, its conventional and generic nature does not lift the claim out of abstractness.

Fourth, claim 1 proceeds to claim retrieving data stored in the server in response to either an expiration of time or a request from the CPE. The data is then transmitted to the CPE in multiple sequentially-numbered information signals. The concept of data retrieval from a server is generalized computer activity. Courts have held that the "abstract ideas . . . of collecting, storing, and retrieving data [have been] found patent-ineligible in several recent cases." *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 128 F. Supp. 3d 103, 112 (D.D.C. 2015) (citing *Content Extraction*, 776 F.3d at 1347); *see also buySAFE*, 765 F.3d at 1355 ("[R]eceiv[ing] and send[ing] information over a network . . . is not even arguably inventive."). For instance, in *Content Extraction*, the Federal Circuit invalidated patent claims "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because "[t]he concept of data collection, recognition, and storage is indisputably well-known." 776 F.3d at 1347.

Moreover, in *West View Research, LLC v. Audi AG*, the Federal Circuit held that claims that "do not go beyond receiving or collecting data queries, analyzing the data query, *retrieving and processing the information constituting a response to the initial data query*, and generating a visual or audio response to the initial data query" were directed to the abstract idea of collecting and analyzing information. 685 Fed. App'x 923, 926 (Fed. Cir. 2017) (emphasis added). Furthermore, according to the Patent's specification, the idea of using a timer to control data retrieval is conventional. Specifically, the generic "server 104 stores time periods." '541 Patent at 7:29-30. The "timer may be . . . on a daily basis, weekly basis or monthly basis as preferred by the user/subscriber." *Id.* at 7:33-35. Similarly, the Federal Circuit has also held as invalid claims directed to "sending information back and forth, *at specified time intervals* or in sequence."

22

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1332-33 (Fed. Cir. 2012) (emphasis added). Furthermore, the '541 Patent specification describes as conventional the process of initiating the data retrieval process as a request from the CPE. The specification discloses that when a CPE initiates a request for data retrieval, it can take the form of "more *conventional* methods such as the dialing of a 1-800 call center number or logging on to a website. . . . This request may come directly from utilizing the CPE *as is known in the art* or may come from the user's own *conventional* computer or *conventional* telephone or any other third party telephone." '541 Patent at 9:9-18 (emphasis added). Lastly, the transmission of data in multiple sequentially-numbered signals is a known process. The specification discloses that the data to be transmitted "in connection with IP protocol transfer, [can be] portioned into packets for transmission" and then these packets "are transported in one or more info signals." *Id.* at 4:14-22. However, the specification expressly acknowledges that data transfer via IP protocol was known in the art: "Depending on the type of device, communications methods, *as known in the art*, may be utilized to transmit the data between CPE 101 and server 104. For example, . . . internet protocol connection[s may be used]. . . . *As is known in the art*, these techniques may be used to send any type of data request or data signal." *Id.* at 3:45-55 (emphasis added).

Claim 1 is similar to other claims the Federal Circuit has found to be directed to abstract ideas. For instance, in *Two-Way Media*, the claim in question was directed to "first processing the data, then routing it, [and] controlling it." 874 F.3d at 1339. This was done in the context of "transmitting message packets over a communications network." *Id.* at 1334. Here, claim 1 discloses a similar structure to the *Two-Way Media* claim. First, data is *processed* by formatting the data stored at the CPE. Then, data is *routed* by transmitting the data from the CPE across a mobile network to a server. Lastly, data is *controlled* by retrieving data from the server and transmitting it to the CPE, a process controlled by either an expiration of time or a request from the CPE.

In addition, claim 1 is similar to the claims in *Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601 (D. Del. 2017), *aff'd*, 725 Fed. App'x 976 (Fed. Cir. 2018). In

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

*Symantec*, the claims were directed to "copying data from one location to another several times and sending a confirmation that the data has been received." *Id.* at 607. Here, data is processed and *copied* from one location, the CPE, to be *received* at another location, the server. Instead of merely sending a confirmation signal when data is received at the remote location as the *Symantec* claims recite, the server can send data back to the CPE in the data retrieval process. The *Symantec* court found the claims to be abstract because "the focus of the claims is the abstract idea of backing up data." *Id.* According to *Symantec*, it is "undisputed that institutions have long backed up data in general." *Id.*

In Plaintiff's opposition, Plaintiff argues that the Federal Circuit has "confirmed that improvements to data storage and computer memory systems . . . are patent eligible." Opp. at 18. Specifically, Plaintiff cites *Visual Memory*, 867 F.3d at 1259. However, *Visual Memory* is inapposite. The *Visual Memory* claims were directed to a "computer memory system." *Id.* The *Visual Memory* claims "focus on a specific asserted improvement in computer capabilities—the use of programmable operational characteristics that are configurable based on the processor—instead of on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Id.* at 1259-60 (internal quotation marks omitted). Here, claim 1 does not focus on an improvement in computer capability, but rather, just the opposite. The tangible computing devices found in claim 1—the CPE and the server—are nothing but generic, as the '541 Patent's specification has shown. The server is merely a tool with which the data storage and retrieval process from the generic CPE is accomplished. *See, e.g.*, '541 Patent at 4:61-62 ("As discussed above, server 104 stores the data in an organized manipulatable form."); *see also TLI*, 823 F.3d at 611 (holding that a server designed to store "digital images in an organized manner" was generic). There is nothing in claim 1 to indicate that the server or the CPE are improvements on prior art servers and CPEs.

Moreover, Plaintiff cites *Enfish*, which dealt with claims directed to "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory," and held that the claims were not abstract. 822 F.3d at 1339. However, similar to *Visual Memory*, the *Enfish*

"claims are directed to a specific implementation of a solution to a problem." *Id.* Here, as discussed in reference to *Visual Memory*, claim 1 is not directed to a "specific implementation" of any of the claim elements and tangible computing components. *Id.* Rather, claim 1 discloses well-known steps to be executed on generic computing devices. Thus, claim 1 is set apart from the *Enfish* claims by the lack of specificity of the claim language and the generic nature of the claim elements.

In sum, the Federal Circuit has held that "[g]eneralized steps to be performed on a computer using conventional computer activity are abstract." *RecogniCorp*, 855 F.3d at 1326. All of the aforementioned steps are, according to the specification and case law, conventional computer activity. Moreover, these steps are performed on generic computing devices such as a CPE and server, and there is no evidence from the specification that these computing devices are anything but generic. Notably, Plaintiff's opposition fails to cite anything from the claim or specification that would indicate otherwise.

### 2. There are Long-Standing Practices Analogous to the Claimed Steps

Claim 1 is also abstract because as the specification discloses, there are long-standing practices analogous to the claimed steps. Steps that can be performed by a human without a computer are abstract. *See, e.g.*, *Mortg. Grader*, 811 F.3d at 1324 (claims for computer-implemented system to enable borrowers to shop for loan packages anonymously were abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer"); *Content Extraction*, 776 F.3d at 1347 (finding claims abstract where "humans have always performed these functions").

Here, the specification acknowledges that as "electronic devices such as cell phones, iPods, MP3 players, pagers, personal digital assistants (PDA), even personal computers have become more and more personalized, they are used to store more and more user-specific data." '541 Patent at 1:19-22. The specification admits that "[t]he creation of many of these databases, such as address or calendar, is time intensive requiring *manual uploading* at the device, *such as utilizing the keypad of the telephone* in the cell phone example, or the keypad of the PDA in the PDA

Case No. 18-CV-06199-LHK
ORDER GRANTING MOTION TO DISMISS

example to enter each address or calendar event." *Id.* at 1:30-34 (emphasis added). In essence, the specification admits that a human being can manually transfer data from one CPE to another CPE through manual entry, via the keypad, of a cellphone or a PDA. Though at first glance, there appears to be no server on which data is uploaded, this would ignore the role the human being plays in the process of transferring data on CPEs. The human mind essentially acts as the server, a central clearinghouse for data that stores data from a CPE to be retrieved and transmitted to a CPE. Though the data transfer process may be tedious as the calendar or address database may contain many entries, the Federal Circuit has held that "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); *see also Univ. of Fla. Res. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 ("On its face, the '251 patent seeks to automate 'pen and paper methodologies' to conserve human resources and minimize errors. This is a quintessential 'do it on a computer' patent . . . . We have held such claims are directed to abstract ideas"). Thus, claim 1 can be performed manually by a human being.

Plaintiff's opposition argues that no "human or store has ever physically transmitted data . . . across a mobile network to a remote storage server, and then physically retrieved the data on command or on a periodic basis." Opp. at 18-19. Though true, Plaintiff's point misses the mark. So long as the underlying process claimed in the patent can be performed manually by a human, that is enough to find that a patent is directed toward an abstract idea. It does not matter that a human cannot wirelessly transmit and retrieve data. Indeed, in *Content Extraction*, the Federal Circuit rejected such an argument. The *Content Extraction* plaintiff argued that "because human minds are unable to process and recognize the stream of bits output by a scanner," the "claims are not drawn to an abstract idea." 776 F.3d at 1347. The *Content Extraction* court gave no regard to the fact that the claims recited computing devices, and still found the claims abstract because the claims were "drawn to the basic concept of data recognition and storage." *Id.* The *Content Extraction* court stripped away the computing devices in the claims and found that the "basic concept" of the claims was abstract. *Id.* Here, stripping away the computing devices such as a

server and a mobile network, the fundamental steps recited by claim 1—storing data, transmitting data, and retrieving data—can all be performed by a human manually reading the data stored on a CPE, remembering it, then reentering the data back into a CPE.

Accordingly, the Court finds that claim 1 is directed to an abstract idea. The Court next analyzes *Alice* step two.

## C. *Alice* Step Two for Claim 1 of the '541 Patent—Whether the Claim Contains an Inventive Concept

Defendant argues that claim 1's elements were well-known in the art and use only "basic known functions of a mobile phone or PDA," and thus do not transform the abstract idea into a patentable claim. Mot. at 22. On the other hand, Plaintiff argues that "the combination of the components, how they interact, and the purpose for which they were combined, as disclosed in the '541 Patent, were unconventional and novel." Opp. at 19.

"In step two of the *Alice* inquiry, [the Court] search[es] for an 'inventive concept sufficient to transform the nature of the claim into a patent-eligible application." *RecogniCorp*, 855 F.3d at 1327 (quoting *McRO*, 837 F.3d at 1312) (internal quotation marks omitted)). "To save the patent at step two, an inventive concept must be evident in the claims." *Id.* This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349; "must be more than well-understood, routine, conventional activity," *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016); "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355. "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

The Court finds that none of the claim's elements, assessed individually, provides an inventive concept. Claim 1 discloses: (1) storing data at the mobile customer premises equipment

27

("CPE"); (2) formatting the data stored at the CPE; (3) transmitting the data with a user ID from the CPE across a mobile network to a server; (4) retrieving data stored in the server in response to either an expiration of time or a request from the CPE; and (5) transmitting the data to the CPE in multiple sequentially-numbered information signals. '541 Patent at 10:52-11:4.

As discussed above, none of claim 1's elements are unique to the '541 Patent. In fact, the patent specification confirms that the '541 Patent did not invent the limitations found in claim 1.

For instance, the specification acknowledges that the Patent did not invent CPEs. The specification gives examples of conventional CPEs: "mobile devices such as cell phones, personal digital assistants (PDAs), iPods™ and MP3™ digital recorders (collectively known as CPEs)." *Id.* at 2:64-66.

Moreover, the specification confirms that the process of formatting the data stored at the CPE was known in the art. The specification admits that "[f]ormatting is performed by [the] CPE," *id.* at 5:50-51, and as discussed above, the CPE is a generic computing device. Also, claim 1 discloses that the process of formatting the data consists of "tagging" data that "correspond to a respective data field." *Id.* at 10:57-59. However, the patent specification concedes that "[*a*]*s known in the art*, the structure of the data may identify each element type by using unique *tags* for the different record types. . . . By utilizing a unified tag and data structure, the methodology and system enables different types of CPE to interpret the data structure accordingly." *Id.* at 3:34-42 (emphasis added). Thus, the Patent itself concedes that the process of tagging data that correspond to a respective data field was known in the art, and thus conventional.

Furthermore, transmitting data with a user ID, which is vaguely defined in the specification as "an identifier . . . to identify the device for which data is being backed up," is hardly anything more than well-understood, routine, conventional activity. Use of an identifier in conjunction with data transfer is routine. Per the *Content Extraction* court, the "concept of data collection, *recognition*, and storage is undisputedly well-known." 776 F.3d at 1347 (emphasis added). The specification also admits that "communication methods, *as known in the art*, may be utilized to transmit the data between CPE 101 and server 104." '541 Patent at 3:45-47 (emphasis added). In

addition, the server is also a standard, well-known server. *See, e.g.*, *id.* at 2:1-2 ("The remote server receives data from the CPE for remote storage by the server."); *id.* at 2:20-21 ("The server collects the data and stores it."); *id.* at 5:10-13 ("[S]erver 104 could easily be another CPE, either inside or outside of network 102, or a server located within network 102 communicating with the target CPE across a mobile network."). Moreover, the mobile network is generic, as disclosed in the specification. *Id.* at 3:2-3 ("As is known in the art, mobile network 102 has an access point at a switch 103.").

Finally, claim 1 proceeds to claim retrieving data stored in the server in response to either an expiration of time or a request from the CPE. The data is then transmitted to the CPE in multiple sequentially-numbered information signals. Courts have found that "collecting, storing, and retrieving data [have been] found patent-ineligible in several recent cases." *Encyclopaedia Britannica*, 128 F. Supp. 3d at 112 (citing *Content Extraction*, 776 F.3d at 1347). For instance, in *Content Extraction*, the Federal Circuit invalidated patent claims "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because "[t]he concept of data collection, recognition, and storage is indisputably well-known." 776 F.3d at 1347. Furthermore, according to the Patent's specification, the idea of using a timer to control data retrieval is conventional. Specifically, the "server 104 stores time periods." '541 Patent at 7:29-30. The "timer may be . . . on a daily basis, weekly basis or monthly basis as preferred by the user/subscriber." *Id.* at 7:33-35. Similarly, the Federal Circuit has also held as invalid claims directed to "sending information back and forth, *at specified time intervals* or in sequence." *Dealertrack*, 674 F.3d at 1332-33 (emphasis added). Also, the specification describes as conventional the process of initiating the data retrieval process as a request from the CPE. Specifically, when a CPE initiates a request for data retrieval, it can take the form of "more *conventional* methods such as the dialing of a 1-800 call center number or logging on to a website. . . . This request may come directly from utilizing the CPE *as is known in the art* or may come from the user's own *conventional* computer or *conventional* telephone or any other third party telephone." '541 Patent at 9:9-18 (emphasis added). Lastly, the transmission of

data in multiple sequentially-numbered signals is a conventional process. The specification discloses that the data to be transmitted "in connection with IP protocol transfer, [can be] portioned into packets for transmission" and then these packets "are transported in one or more info signals." *Id.* at 4:14-22. However, the specification expressly acknowledges that data transfer via IP protocol was known in the art: "Depending on the type of device, communications methods, *as known in the art*, may be utilized to transmit the data between CPE 101 and server 104. For example, . . . internet protocol connection[s may be used]. . . . *As is known in the art*, these techniques may be used to send any type of data request or data signal." *Id.* at 3:45-55 (emphasis added).

Thus, none of claim 1's elements, assessed individually, provides an inventive concept. After all, "[i]nstructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." *Capital One Bank*, 792 F.3d at 1368. Moreover, the ordered combination of these elements also does not yield an inventive concept. In *BASCOM*, the Federal Circuit held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." 827 F.3d at 1350. However, the arrangement of claim 1's elements are conventional, as evidenced by *Dealertrack* and *Two-Way Media*.

In *Dealertrack*, the claims were directed to "receiving data from one source[,] . . . selectively forwarding the data . . . and forwarding reply data to the first source." 674 F.3d at 1333. Similarly here, claim 1 discloses that a mobile network *receives* data from CPE, *forwards* the CPE data to the server, then *forwards* data sent back from the server to the CPE when some predetermined time interval expires or upon request from the CPE. The fact that this data forwarding process in *Dealertrack* was "computer-aided" did not make it any more patent-eligible. *Id.* Thus, the *Dealertrack* court invalidated the claims.

In *Two-Way Media*, the claim in question was directed to "first processing the data, then routing it, [and] controlling it." 874 F.3d at 1339. This was done in the context of "transmitting message packets over a communications network." *Id.* at 1334. Here, claim 1 discloses a similar

structure to the *Two-Way Media* claim. First, data is *processed* by formatting the data stored at the CPE. Then, data is *routed* by transmitting the data from the CPE across a mobile network to a server. Lastly, data is *controlled* by retrieving data from the server and transmitting it to the CPE, a process controlled by either an expiration of time or a request from the CPE. The *Two-Way Media* court invalidated the claim, called the ordering of claim elements a "conventional ordering of steps . . . with conventional technology to achieve its desired result." *Id.* Thus, claim 1's elements are also a conventional ordering of steps.

Therefore, claim 1 of the '541 Patent does not contain an inventive concept. The Court finds that at *Alice* step one, claim 1 of the '541 Patent is directed to an abstract idea. At *Alice* step two, there is no inventive concept sufficient to save the claim. Thus, the Court concludes that the '541 Patent is directed to unpatentable subject matter under § 101. Next, the Court addresses whether there are open factual issues that preclude dismissal on the pleadings.

### D. Whether there Exist Factual Questions that Preclude Resolution of the Instant Motion under Rule 12

Plaintiff's opposition cites disclosures in the complaint that purportedly preclude resolution of the instant motion under Rule 12. Opp. at 21-22. For instance, Plaintiff vaguely alleges that the "claim elements, individually or in combination, are unconventional." *Id.* at 22 Likewise, Plaintiff alleges that "[t]he solutions described and claimed in the '541 Patent represented a significant advance over existing approaches and were not well-known, routine, or conventional in the field at the time the application leading to the '541 Patent was filed." *Id.* However, there are no *specific* factual allegations or references to the '541 Patent claims that undergird Plaintiff's purported fact questions cited in Plaintiff's opposition.

Under Federal Circuit law, "[w]hether a claim recites patent eligible subject matter is a question of law which . . . has in many cases been resolved on motions to dismiss or summary judgment." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). "As our cases demonstrate, not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Id.*

In *Uniloc USA, Inc. v. Apple Inc.*, the court found the patent at issue invalid even though the plaintiff insisted there were factual disputes precluding judgment on the pleadings. 2018 WL 2287675, at *7 (N.D. Cal. May 18, 2018). The *Uniloc* court rejected plaintiff's contentions that the claimed invention did not feature "routine and conventional elements like hardware configurations." *Id.* (internal quotations omitted). The *Uniloc* court reasoned that the plaintiff was attempting to "manufacture a factual question" by relying on attorney arguments found in the complaint. *Id.* Here, the situation is analogous to that in *Uniloc*. Plaintiff can merely point to attorney argument found in the complaint as grounds for why claimed elements are not routine or conventional. Thus, per the *Uniloc* court, Plaintiff's attorney arguments in the amended complaint do not create a factual dispute precluding disposition of the instant case on a Rule 12 motion.

Moreover, under Federal Circuit law, the *Alice* inquiry must focus on the *claim language*. *See, e.g.*, *Accenture*, 728 F.3d at 1345 ("[T]he important inquiry for a § 101 analysis is to look to the claim."); *CMG Fin. Servs., Inc.*, 50 F. Supp. 3d 1306, 1326 ("None of the elements in these Claims limit the level of their inherent abstraction."), *aff'd*, 616 Fed. App'x 420 (Fed. Cir. 2015). "In some cases, when improvements in the specification are *captured in the claims*, whether an element or combination of elements is well-understood becomes a question of fact." *Symantec Corp. v. Zscaler, Inc.*, 2018 WL 3539269, at *2 (N.D. Cal. July 23, 2018) (citing *Berkheimer*, 881 F.3d at 1368-69) (emphasis added). Here, attorney argument cannot save the Patent because the purported improvements over the prior art have not been captured in the claim language.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that the '541 Patent is directed to unpatentable subject matter and is thus invalid under 35 U.S.C. § 101. The Court therefore GRANTS Defendant's motion to dismiss.

**IT IS SO ORDERED.**

Dated: April 4, 2019

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge